UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEWELL WINDOW FURNISHINGS, INC.,

    Plaintiff,

v.

THE INTERNATIONAL UNION,
UNITED AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA ("UAW"),

    Defendant.
_____/

CASE NO. 1:11-CV-1080

HON. ROBERT J. JONKER

**OPINION**

**Introduction**

    This is a saga of three interrelated lawsuits affecting healthcare for union retirees from a predecessor of Newell Window Furnishings, Inc. The union retirees have claimed from the start that lifetime medical care was a part of their vested retirement package. They ultimately won that issue on summary judgment because even the company representatives agreed. *See Bender v. Newell Window Furnishings, Inc.*, 725 F. Supp. 2d 643 (W.D. Mich. 2010), *aff'd*, 681 F.3d 253 (6th Cir. 2012) ("*Newell II*"). The journey to that result was not as simple as the conclusion sounds. And this lawsuit is an indication that the journey is not yet complete.

    The opening round of litigation started in the Northern District of Illinois. Newell filed suit there against each and every one of its union retirees, seeking a declaratory judgment that no vested healthcare benefits were owed. Newell joined not only each and every union retiree, but also the UAW itself, as the former representative of those retirees when they were active employees of the

company. *Newell Operating Company, Inc. v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, U.A.W.*, No. 06-cv-50010 (N.D. Ill. Jan. 12, 2006) ("*Newell I*"). The retirees and the UAW responded to *Newell I* by filing their own action here in the Western District of Michigan *(Newell II)*.[1] They ultimately won *Newell II* on the merits after the Northern District of Illinois and the Seventh Circuit dismissed *Newell I* as nothing but a forum shopping gambit by Newell. After losing in *Newell II*, Newell filed a third action – this one – against only the UAW, seeking damages for an alleged breach by the UAW of a Shutdown Agreement that included a covenant not to sue from the UAW in favor of Newell ("*Newell III*"). Newell seeks recovery of the attorney fees and other losses incurred in its losing effort in *Newell II*. Newell's theory is that it would not have suffered the expenses and losses of *Newell II* if the UAW had not joined in and supported the retirees in *Newell II*.

The Shutdown Agreement at the heart of *Newell III* is nothing new. The parties were well aware of it throughout the earlier litigation. In fact, Newell invoked the Shutdown Agreement in *Newell II* in a successful bid to have the UAW dismissed as a party plaintiff early in the case. Both parties also used the Shutdown Agreement to support their positions on the merits in *Newell II*. Newell also asserted in bare-bones form the core of the theory it now elaborates in its *Newell III* Complaint, both before and after the UAW was dismissed as a party in *Newell II*. And obviously Newell knew that the lawyers ultimately confirmed as class counsel in *Newell II* started out the case as counsel for both the putative class and the UAW, but Newell made no effort to challenge the adequacy of their ability to serve as class counsel on that basis.

---

[1] The plaintiffs in *Newell I* – defendants in *Newell II* – were Newell Window Furnishings, Inc., Kirsch Division; Newell Operating Company, Inc.; and Newell Rubbermaid Health and Welfare Program 506.

In the Court's view, the Shutdown Agreement claim that Newell is now asserting in this case should have been litigated, if at all, in *Newell II*, where Newell itself first raised the theory. *Newell II* went to judgment, and principles of claim preclusion merge any potential claim Newell may have had into the *Newell II* judgment and bar Newell from bringing the new action for alleged breach of the Shutdown Agreement.

## Facts

The core dispute in all three Newell cases concerns healthcare benefits for bargaining unit retirees. In *Newell II*, a plaintiff class contended that a series of collective bargaining agreements entitled the class members, their spouses and dependents to vested, lifetime healthcare benefits, including group insurance at various levels in effect at the time of retirement, and full reimbursement of Medicare Part B insurance premiums. The plaintiff class won the issue on summary judgment, *Bender v. Newell Window Furnishings, Inc.*, 725 F. Supp. 2d 642 (W.D. Mich. 2010), and the Sixth Circuit affirmed, *Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253 (6th Cir. 2012).

The UAW had been a plaintiff in *Newell II*, but early in the case the District Court granted a motion under FED. R. CIV. P. 12(b)(6) dismissing the UAW from the case (*Newell II*, docket # 31). No one appealed the dismissal of the UAW. The District Court found that the UAW had no cause of action because of a covenant not to sue in a Shutdown Agreement. The covenant provided:

> By entering into this Shutdown Agreement it is the intent of the Company and the Union to resolve all issues arising out of the employment relationship, including those related to this shutdown and relocation of operations, all wage and benefit issues, and all other disputes and to protect the Company against any and all claims by the Union, its successors and assigns, except those specifically excepted by this paragraph. To this end, the Union, on behalf of itself and its successors or assigns, hereby makes the following waiver and release:

> (a) In consideration of the agreements made herein, the Union, on behalf of itself, its successors and assigns, and consistent with the individual Waiver and Release (attached as "Appendix A"), on behalf of its active members and/or other employees of the Company for whom it acts as the exclusive representative under Section 9 of the National Labor Relations Act, hereby waives, releases and forever discharges the Company from any and all obligations, claims, causes of action, liabilities, grievance or arbitration claims, unfair labor practice charges or actions of any kind (as of the effective date of this Shutdown Agreement), and claims and demands of any kind which the Union now has or ever may have against the Company arising out of the employment relationship . . . except those claims which are based on alleged violations of this Shutdown Agreement, and individual Workers' Compensation and/or state unemployment insurance compensation claims.
>
> (b) The Union agrees not to initiate, solicit, encourage or finance any civil action, litigation or administrative claim of any type against the Company covering any matter other than enforcement of the terms of this Shutdown Agreement.

(*Newell II*, docket # 31, 7-8.) The District Court concluded that "[t]he Union's broad release of claims on its, or its successor's, behalf precludes it from bringing any claim against Newell other than claims based on violations of the Shutdown Agreement and/or state unemployment insurance claims." (*Id.* at 13.)

Newell had actually fired the opening shot that initiated the entire litigation odyssey. *Newell I* began when Newell and several related entities filed a declaratory judgment action in the Northern District of Illinois seeking to establish that the bargaining unit retirees were not entitled to vested, lifetime healthcare benefits. *Newell v. U.A.W.*, No. 06-cv-50010 (N.D. Ill. Jan. 12, 2006). In the declaratory judgment action, Newell joined every retiree individually. Newell also joined the UAW as a defendant. The UAW and the retirees responded by filing *Newell II* in the Western District of Michigan. The District Court in Michigan waited for the District Court in Illinois to decide if the case should proceed there. (*Newell II*, docket # 31, at 3.) Ultimately, the Northern District of Illinois court dismissed the case in its entirety on jurisdictional grounds in favor of the

action in the Western District of Michigan. *Newell v. U.A.W.*, No. 06-cv-50010 (N.D. Ill. March 27, 2007). In dismissing the case, the court commented that "[Newell] brought this action here for the sole purpose of choosing a forum by attempting to win a race to the courthouse by filing a declaratory judgment action that anticipated the litigation to be filed by the retirees and the Union." *Id.* The Seventh Circuit affirmed the Northern District of Illinois court's decision. *Newell Operating Co. v. UAW*, 532 F.3d 583 (7th Cir. 2008) (*overruled on other grounds by Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983 (7th Cir. 2010) and *NewPage Wisconsin System Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy Allied Industrial and Service Workers International Union, AFL-CIO/CLC*, 651 F.3d 775 (7th Cir. 2011)). Accordingly, the case proceeded on the merits in the Western District of Michigan.

The plaintiff class won summary judgment against Newell. The Court found that "the language of the collective bargaining agreements, the extrinsic evidence of the actual negotiations on both sides of the table, and Defendant's own after-the-fact due diligence memorandum all agree on the key point of lifetime vesting of healthcare benefits for qualified retirees." *Bender*, 725 F. Supp. 2d at 645. The Court found "the contract language . . . so plain that when Defendants were investigating purchasing the Sturgis plant, their own attorneys reviewed the collective bargaining agreements and concluded that the retirees were entitled under them to vested lifetime benefits." *Id.* The Sixth Circuit affirmed:

> The district court found that the parties unambiguously intended that retiree health insurance benefits would vest for bargaining unit retirees (and their eligible spouses and dependents) who retired prior to January 1, 1994, but that, even if the CBAs were deemed to be ambiguous, 'the entire review of extrinsic evidence demonstrates, without a single contradictory voice, that the parties intended to vest lifetime retiree healthcare benefits.'" We agree.

*Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 267 (6th Cir. 2012).

While *Newell II* was pending on appeal, one of the losing defendants, Newell Window Furnishings, Inc. ("Newell"), filed another lawsuit – *Newell III* – against the UAW alone. The theory of the new lawsuit was that the UAW breached a Shut-Down Agreement with Newell by joining as a plaintiff in *Newell II* in the first place. This was a "Back to the Future" lawsuit, because Newell had already raised the theory in the pleadings in *Newell II*. In the original answer in *Newell II*, Newell asserted as an affirmative defense the same claim against the UAW it now brings in this case. (*Newell II*, docket # 33, at ¶ 46.) In its Eighth Defense, Newell stated:

> Under the terms of the Shut-Down Agreement, which the Court held in its Order and Judgment issued July 9, 2008, that the UAW had breached, this Court should . . . order the UAW to cease paying for the costs of the lawsuit, and order the UAW to reimburse defendants for the costs incurred, including legal fees, in this lawsuit and in the action filed in the United States District Court for the Northern District of Illinois.

(*Id.*) Newell asserted the point again in a response to a class certification motion: "The filing of this action was not initiated primarily by Plaintiffs; rather, the UAW (in violation of its Shut-Down Agreement with Newell Window under which Newell Window left this district) initiated and initially maintained this litigation." (*Newell II*, docket # 93, at 11.) And Newell raised the issue as an affirmative defense in its Amended Joint Answer to the Third Amended Complaint: "Under the terms of the Shut-Down Agreement, which this Court held in its Order and Judgment, issued July 9, 2007, that the UAW had breached, this court should dismiss the Complaint and order Plaintiffs to pay personally for the filing and pursuit of this lawsuit." (*Newell II*, docket # 115.)

Ultimately, after the District Court granted the motion to dismiss the UAW, nothing else was actually adjudicated in *Newell II* between the UAW and the losing defendants. Neither the dismissal

6

of the UAW from the case nor Newell's claim that the UAW should pay all the attorney fees was raised on appeal. After prevailing on appeal on the merits of the case, class counsel sought fees. At that point, Newell argued, among other things, that the Court should not award fees because the UAW would "benefit from any fee award based on the UAW's financing of this action or any other action in violation of [the] Shutdown Agreement." The Court disagreed and awarded fees to the plaintiff class. (*Newell II*, docket # 324.) The Sixth Circuit affirmed, finding that the Court "did not abuse its discretion in awarding fees to [the plaintiff class] that will ultimately go to the UAW." *Bender v. Newell Window Furnishings, Inc.*, No. 12-2059, slip op. (6th Cir. March 17, 2014).

In the case now before the Court, Newell reiterates the claims it made in *Newell II* that the UAW breached the Shutdown Agreement by pursuing the *Newell II* litigation, and again argues that Newell is entitled to attorney fees incurred in *Newell II*, as well as attorney fees incurred in *Newell I* and *Newell III*. Newell also claims it is entitled to damages because it has been forced to incur liability to the retiree class. In essence, using the Shutdown Agreement theory, Newell asks to shift the financial costs of its loss on the merits to the UAW. The UAW moves for judgment on the pleadings under FED. R. CIV. P. 12(c).

**Legal Standard**

The standard of review for a motion under Rule 12(c) is the same as for a motion under Rule 12(b)(6). *Fritz v. Charter Tp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). "For purposes of a motion for a judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577,

7

581 (6th Cir. 2007) (internal quotation marks omitted).  The Court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (internal quotation marks omitted).

## Discussion

In asserting anew its claim that the UAW breached the Shutdown Agreement, Newell in essence seeks "to put aside the first disposition of [its] dispute[] so as to pursue again [its] own notion of absolute truth and justice." 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4401 (2d ed. 2002). The doctrine of res judicata has developed to preclude such repetitious litigation, "respond[ing] to the perception that '[a] lawsuit is not a laboratory experiment for the discovery of physical laws of universal application but a means of settling a dispute between litigants.'" *Id.*  Clear rules of res judicata "make it possible for a dispute to be settled by a single litigation" and for the parties "to rely on the judgment, to measure a sense of repose against it, and to avoid repetitive litigation that tests its limits." *Id.*  Res judicata serves the crucial purpose of "finally ending private disputes," recognizing that "[t]he central role of adversary litigation in our society is to provide binding answers[,] . . . free[ing] people from the uncertain prospects of litigation, with all its costs to emotional peace and the ordering of future affairs." *Id.* at § 4403.  Indeed, "[r]epose is the most important product of res judicata." *Id.*  Res judicata  "precludes not only relitigating a claim previously adjudicated; it also precludes litigating a claim or defense that should have been raised, but was not, in the prior suit." *Mitchell v. Chapman*, 343 F.3d 811, 819 (6th Cir. 2003).  "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

"Claim-preclusion rules addressed to plaintiffs are mirrored by preclusion rules addressed to defendants." Wright, Miller & Cooper, *supra*, § 4410. Such rules address situations, among others, in which a former defendant seeks to advance a claim against the original plaintiff. *Id.* Claim preclusion rules applied to defendants arise out of the same logic and promote the same policy objectives as res judicata. FED. R. CIV. P. 13(a), the principal claim preclusion rule applicable to defendants, provides that

> [a] pleading must state as a counterclaim any claim that – at the time of its service – the pleader has against an opposing party if the claim:
> (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and
> (B) does not require adding another party over whom the court cannot acquire jurisdiction.

Thus, to constitute a compulsory counterclaim, a "claim must bear a logical relationship to the opposing party's claim." *Ashbrook v. Block*, 917 F.2d 918, 923 (1990) (internal quotation marks omitted). However, "there need not be a precise identity of issues and facts between the claim and the counterclaim." *Transamerica Occidental Life Ins. Co. v. Aviation Office of America*, 292 F.3d 384, 389 (2002) (Alito, J.). Rule 13(a) exists to promote judicial economy, and "the term 'transaction or occurrence' is construed generously to further this purpose." *Id.* at 390.

While Rule 13(a) is the principal rule of claim preclusion addressed to defendants, cases also "show the need for additional defendant rules of preclusion." Wright, Miller & Cooper, *supra*, § 4410. For example, in a Seventh Circuit case the court found that although Rule 13(a) did not apply to the claim raised in that case, the claim was still barred, because it fell within "a narrowly defined class of 'common law compulsory counterclaims.'" *Martino v. McDonald's System, Inc.*, 598 F.2d 1079, 1083 (7th Cir. 1979) (citing Restatement (Second) of Judgments § 56.1(2)(b),

9

Reporter's Note on Comment f (Tent. Draft No. 1, 1973)). *Martino* emphasizes that "the well-settled rule for the purpose of determining the res judicata effect of a judgment is that a 'cause of action' comprises defenses . . . that were or might have been raised." *Id.* at 1084.

Whether viewed through the lens of res judicata, Rule 13(a), or common law compulsory counterclaim, principles of claim preclusion dictate dismissal of Newell III.

In determining whether res judicata bars an action, courts in the Sixth Circuit consider whether the following four factors are present: (1) the prior decision was a final decision on the merits; (2) the present action is between the same parties or their privies as those to the prior action; (3) the claim in the present action should have been litigated in the prior action; (4) an identity exists between the prior and present actions. *Mitchell*, 343 F.3d at 819. All four factors are present in Newell III. The first two are very straightforward. Newell II was a final decision on the merits of the contract dispute between Newell and the plaintiffs in that case. Final judgment entered for the plaintiffs and against Newell. The parties were the same too. Newell itself named the UAW as a defendant in Newell I. In Newell II, the UAW was a plaintiff, and Newell was a named defendant. The actions were, to this extent, mirror images of each other, and the same parties are now facing each other in Newell III.

The third and fourth elements of the res judicata test get at the same fundamental point: is the relationship between the earlier case and the present case sufficiently close so that it is fair to expect the parties to have raised and resolved the issue, if at all, in the earlier action? Here, the answer is "yes." In the first place, Newell itself made the decision to bring the UAW directly into the controversy by suing the UAW in Newell I. More importantly, in Newell II, Newell demonstrated that the present issue should have been raised, if at all, in that earlier case, because

Newell actually did raise the claim muliple times in Newell II, not only as the linchpin of a motion to dismiss, but also as an affirmative defense both before and after Newell won the motion to dismiss. In addition, the claim Newell raises here also was fairly part of the class certification process, at least on the question of the adequacy of class counsel. Moreover, both sides in Newell II referenced and analyzed the Shutdown Agreement – the contractual basis of Newell III – in the litigation of the merits of that case. Finally, the damages theory Newell now asserts would essentially shift every economic consequence of the Newell II decision from the defendants in that case to the UAW. This would entirely undo Newell II, making it clear that an identity exists between the prior and present actions, which involve the very same Shutdown Agreement language.

Looking at the issue through the narrower lense of Rule 13(a) yields the same result. Newell's claim here to shift the economic consequences of Newell II to the UAW arises directly out of subject matter of the *Newell II* plaintiffs' claim. Indeed, Newell acknowledged as much by naming the UAW in the original action Newell brought in the Northern District of Illinois. The Michigan action and the Illinois action were, as a practical matter, mirror images of each other. Newell also acknowledged the logical relationship between the claims by asserting as an affirmative defense in Michigan that the Court should order the UAW to cease funding the litigation and reimburse defendants for their legal fees and costs in both *Newell II* and the action Newell itself filed in the Northern District of Illinois. The claim Newell raises in Newell III should have been asserted as a counterclaim in Newell II and is now barred.

Newell contends that Rule 13(a) does not apply here, because the Court granted its motion to dismiss the UAW in Newell II before Newell answered the complaint. Newell posits that once the UAW was dismissed, there was no "opposing party" against which to counterclaim. Newell's

11

own pleadings show otherwise. Newell raised as an affirmative defense in Michigan the very theory it now raises. More than that, it did so after the District Court granted its motion to dismiss the UAW. It then did nothing to pursue the claim despite ample opportunity to do so as the *Newell II* litigation proceeded in the District Court and on appeal. Having actually asserted the theory as an affirmative defense, Newell cannot now be heard to argue it should be held to the consequences of choosing not to pursue it in Newell II. The labels of "affirmative defense" or "counterclaim" are not controlling; the question is whether Newell put the matter at issue in Newell II. It plainly did.

But even if the claim Newell now raises was not a compulsory counterclaim in *Newell II* under the strictest reading of Rule 13(a), it would still be precluded under the kind of common law compulsory counterclaim logic *Martino* articulates. The Sixth Circuit recognized as much in *Dryvit Systems, Inc. v. Great Lakes Exteriors*, Inc., 96 F. App'x 310 (6th Cir. April 20, 2004). *Dryvit* was the second litigation between the same parties concerning the same contract, a distributorship agreement. *Dryvit*, 96 F. App'x at 311. In the first litigation, GLE sued Dryvit for breach of contract and lost. *Id.* In the second litigation, Dryvit sought to enforce a contractual right to attorney fees under the same distributorship agreement, which included a provision for reimbursement of attorney fees and costs to the prevailing party. *Id.* The Sixth Circuit found that under these circumstances, attorney fees and costs were not "collateral to the merits," and Dryvit should have brought its claim for attorney fees in the original action. *Id.* at 311-12. This was true even though Dryvit had not prevailed until it won in the trial court on the merits. The court applied Michigan law, but the same rationale applies in this case. The damages Newell seeks are in no way "collateral to the merits" of Newell II. And even though Newell prevailed to the extent of having the UAW dismissed as a party,

it should not have waited for a new lawsuit to raise the claims it is now making against the UAW based on that win.

**Conclusion**

Claim preclusion is a doctrine that requires parties to litigate in one action the whole bundle of claims and defenses they have against each other that bear a logical relationship to the subject matter of the litigation.  This case is an attempt by Newell to raise in a new case a theory of relief that was integrally bound up with the issues adjudicated in the earlier case.  Indeed, Newell even asserted in its own pleadings in the earlier case the theory it now tries to advance here.  In the Court's view, the time to test that theory was in Newell II, and the Final Judgment in that case bars Newell from attempting to bring the claim now.


Dated:      June 19, 2014             /s/ Robert J. Jonker
                                      ROBERT J. JONKER
                                      UNITED STATES DISTRICT JUDGE